Good morning, this case involves a recidivist infringer that's again attempting to utilize its original infringement to its benefit. This case arises from the fact that the defendants continue to use Mr. Bouchat's work and have the opportunity in the free market system either not to use it or to purchase a license for its use. Instead of using the free market system, they proceed to continue to use it. Now this court addressed the fair use of the use of Mr. Bouchat's work in what we'll refer to in the briefs as Bouchat IV. There's two parts to that opinion. The first part found in Part 3A1, I believe, which deals with purpose and character. And I should say purpose and character or the transformation of the work is the central issue in this case. It's the guts of what we contend Judge Garbus erred in his decision granting summary judgment below. Clearly, I think Judge Michael's opinion concerning the films showed in the stadium and the yearly highlight films that were sold to the public for the years 1996, 97, and 98. So in Bouchat IV, the films that were shown were highlight reels and highlight films from the 1996 to 1998 seasons. In part, there was 30-second segments of those games that were shown at the stadium itself during the game between a timeout. So that's one component of that opinion. And the other was the highlight films that the court's referring to, which involved commentary and narrative and discussion that Judge Michael recognized involved the historical record of the Ravens. I think that case, although those films were labeled as historical commentary, the label now has changed to documentary with regard to the films being displayed by defendants on NFL Network and on NFL.com. The films that were shown as highlight films in the stadium or whatever, those films sort of focused and concentrated on the replay of the 1996 to 1998 seasons when the Ravens were using the retired bee, the flying bee. The question that I had for you is that a highlight film from those precise seasons would necessarily involve a substantial use in probably every frame of the logo or the trademark. But where you're talking here, you're talking about a much more fleeting, transient use as opposed to something where the actual seasons and games are front and center. So the difference between a substantial focused use and an incidental fleeting use of a few seconds seems to me to be one distinguishing factor. And the other question I had, the historical footage here tells a story that's very different from the original seasons themselves. The historical narrative is really different from the original seasons. So the question I have with respect to Boo Shot 4, there seem to me arguably to be two distinguishing factors. One, the very brief, transient, fleeting use here. And number two, the different narrative line about draft picks and the rest, et cetera, et cetera. And so I don't understand why this wouldn't do a great deal more damage to the whole enterprise of documentary filmmaking than the holding in Boo Shot 4 would. Let me answer, I think your references as documentary filmmaking at the end adds a third component to your question. Clearly, documentary can be whatever you want to make it, amorphous or what have you. But in terms of the two questions you started with, the one about the incidental and the different narratives and commentary, one under fair use analysis, it's not the amount of the work. It's the amount of the work for the fair use analysis, what portion of the work is used. It's not where it's used in the work. It has to do with what portion of the infringed work is used. And I think that is the appropriate fair use analysis under… Fair use is generally thought to allow quotations of passages that are less than 500 words. But if it's over, then you have to receive permission from the author. And so it seems that if fair use is getting anything, it says that, okay, the free exchange of ideas and information has got to provide some shelter for very modest, minimalist uses. That's what I always understood. Of language that's extracted. But the focus, and I think where I see this differently than Your Honor, is the court's question is conflating the appropriating work's use of the appropriated work. 100% of the appropriated work is being used. It's not like a portion of it's being divided up somehow as if it were a literary work. And if you go back to the decisions of this court, it's not like we're taking a portion of the language here, a very minimal part of it, and using it as an incidental commentary where we've transformed this either in terms of its purpose or added some expression to it. Nothing has been done to change the use of the work here. It's still a logo. It's not a literary work that we're going to extract things from. That would be true in any historical documentary where the trademark popped up. I mean, it's almost impossible to use a quarter of a trademark or a half of a trademark. I was thinking when I prepared this case about this marvelous picture by the artist, Edward Hopper, where the fellow's sitting alone in front of a gas station and there's an S.O. sign behind him. I don't know whether you're familiar with the particular picture, but I mean, I don't know how far all this goes, because, I mean, is this artist going to be liable now for having the fellow sit in front of... That's not what we have here. What we have is a logo that's still being used as a logo. It was the original infringement. The original infringement in those films is still being used in the very same fashion. It's being used in its entirety. If it's incidental, then that might be an issue for injunctive relief. How do you use half a logo? Well, you can't. That's my very point. The logo is an identifying symbol. It's not a trademark. So your view is that because the logo was used, that no matter how minimal the use and no matter how transformative the use and no matter whether there's commercial exploitation of the logo or not, that that's impermissible? Well, that's a loaded question. And first of all, we're discussing the transformation, all right? And as I said, this is the key. No, no, no. Before we discuss that, your view is that no matter how short a time something is used and regardless of whether they're seeking at this point in time to commercially exploit, that that's not going to fall within the... They're adjudicated infringers using the very same work in the very same fashion. Nothing's been transformed other than giving it a label of being historical or commentary. And this very same argument was rejected in Boucher 4 in the panel decision. Does your argument require all of those factors? If the city of Baltimore was showing, in connection with the Super Bowl victory, showing highlights that included a highlight from the season when the objectionable logo was seen, would the city of Baltimore be liable for infringement? That's a whole different analysis. Excuse me. Well, I mean, that was part of my question. Why wouldn't the analysis be the same? Well, the question there, if the city of Baltimore utilizes it, there still would not be a transformative change. It still would be used as a logo. There was no transformation. But other factors in the fair use analysis... Such as? Such as the issue about commercial use and what have you. Innocent infringer. Excuse me. It's used by the Chamber of Commerce as an expression of civic pride and to attract business. Again, there's no transformation, and you have to give a record-intensive analysis. There probably is transformation here, but I think the concern I have is you're making this use violative. I mean, I was impressed with the amicus brief in this case about the damage this can do to a perfectly innocent and ordinary flow of information. And one phrase in that amicus brief sort of jumped out at me, that copyright law is very important, and it protects creativity. And I think your client was a very creative person, and there was certainly an original infringement there. But if you carry it this far, when that amicus brief said, you know, that copyright holders shouldn't hold historical films hostage. And you can't give them completely free reign or veto over how history is filmed and told. I mean, that would be... You know, there's been more and more commentary now on the tension and conflict between copyright law and not only the statute but the First Amendment and the free flow of information in our society. And as I say, some amicus briefs are good and some are less useful, but I thought the amicus brief here was very powerful in spelling out what the circumstances were. The distinctive factor in this case is that you have the original infringer attempting to benefit by its own exploitations. I get what you're saying, but it would be a more persuasive argument if there was a district court finding that the original offender was continuing to proceed in bad faith or in violation of court order or whatever, but there's no bad faith finding here. And as far as I can see, there's no attempt to commercially exploit. And so your whole idea of, well, this is the original offender, would be more persuasive to me if there were a finding of bad faith or a finding of commercial exploitation. But we don't have those findings. But certainly when you use these films on NFL.com or the NFL Network, they're being commercially exploited. This is not a charity. One of the films, the feature in the films is Lawrence Phillips. He didn't even play for the Ravens. He played for the St. Louis Rams. And the helmet's used to distinguish his team from the Ravens' team. It's commercial. That's the very point you can't get by. This is not the Chamber of Commerce. This is not some other entity attempting to use this for historical purposes. This is the very same bad guys who have been twice adjudicated infringers. And I think Boucher Four is right on point in this regard, but putting that aside, you get the very same bad guys that are attempting to exploit their badness. I understand that they infringed and that's been adjudicated. The only question is, do you just continue to flagellate and flagellate and flagellate when there's no attempt to commercially exploit it, when the subsequent use of it is in a totally different historical vein? I mean, how far do you carry this? I mean, it eventually almost puts the copyright holder, it gives them the hand of a censor in this. And I really do, I worry deeply about the First Amendment implications of going that far. I don't have any brief for what they initially did. I thought you had a good case, but I just can't see carrying it to the very farthest extreme. The very farthest extreme would be, in my view, with all due respect, for the court to say, use of these works on NFL.com and NFL Network is not commercial. To me, that would turn the copyright law upside down, it would turn Judge Michael's decision upside down, and it would sidestep established precedent of this court. Hold on for a second. I'll reserve the rest of my time if I could. Mr. Raskoff. Yes. Good morning. My name is Robert Raskoff with the appellees. I'll try to be brief, Your Honors. The documentaries and stadium photos in this case recount and explain the history of the National Football League and its member teams and players. They're classic candidates for copyright fair use because they use the Flying B logo briefly, incidentally, factually, and historically. In this presentation, I will cover the four factors, the four copyright factors. But we do agree with counsel that transformation... I mean, there was no marketing of the logo here. There was no attempt to advertise the film as being about the Ravens or anything. But there was no attempt to sell Ravens paraphernalia. No, Your Honor. It's not at all like using that now-discarded logo, which has not been the logo of the team for 14 years, it is not like using that as the centerpiece of a merchandising program. It's completely the opposite. There are times when we are captive to history, too, and are producing documentaries about the National Football League that incidentally, remotely, and for historical reasons, happen to capture in a fleeting way, as Your Honor suggested, seconds at a time in the context of a half-hour program or a 40-minute program. Lawrence Phillips, you're right, has nothing to do with the Ravens, except... Except they happen to be tackled by someone. You got it. Exactly. So, can we not for one or less than one second? It's even hard to see. If you go back, and I'm sure you have looked at these videos, but it's hard to see the logo. That's how quick the tackle is. And the point of it, and this is what transformation is all about, the point of the use is not the same. It's to show the point of that story, which is that Lawrence... The historical narrative in some of these films is to show that the draft is a very risky business. Of course. And that some draft classes work out really well, and others just explode in your face. And that's a different story from a highlight reel of the actual infringing seasons. They're just... It's just as different as night and day. Well, the court characterized the highlight films in the last case as simply filmed football games. We don't have that here. We have completely other new stories, the essence of transformation. The Ray Lewis is all about the life and times of Ray Lewis, and, of course, he played under both team logos. Hold for a second. Sure, excuse me, Your Honor. My colleague has a question. I... It seems to me a closer case with respect to the club-level installations, because presumably it is... It really can't be compared to a museum, in that it is... It's not free. The admission isn't free. I imagine the purpose of that is to... Or help me understand. I will.  This is an attraction to an elite group of customers. Well, the stadium photos, Your Honor, are equally transformative, as transformative as the others. You'll remember in that 2010 case, you found that the use of the same type of photos in the lobby display was transformative. Now, contained in the stadium photos... Let me just recount what the stadium photo area is like. They're contained within a clearly chronicled, carefully arranged, and curated history of football in Baltimore. It starts in 1881. A club... A customer purchases... Has to purchase a club-level ticket, right? To have access to the club level? There are tickets... Yes, you have to purchase a ticket in order to sit in the seat at that level. Yes, Your Honor. And so it is restricted, and the restriction is tied to, I would imagine, a higher monetary level, correct? Well, yes. I think, Your Honor, is getting to the commerciality, perhaps. And that's the... I think that that is one area where I think that there is... the commercial aspect of it is harder for you to respond to. Well, first issue is, once you have purely transformative or clearly transformative works, the commerciality recedes. And that comes right out of the Supreme Court case in Campbell. The more transformation you have, the less significance, like commerciality, are the other factors. That's in our brief, and it's in page 579 of the Supreme Court opinion. So that is... And again, as Judge Wilkinson pointed out, the... Yes, it's a commercial venture at some level. But the question is, the relationship between the particular use of the logo in question and revenue. And here we have, as Judge Garbus held below, you have a very faint relationship. You have, in the words of the court in the Green Day case, not an overly commercial employment of the logo in question. There's no one in which you do stand to extract some profit. In the record, in this case, not disputed is that, from our own witness, Mr. Petillo, that there is no way to attribute any, you know, revenue to the fact that the Ravens... Old Ravens logo appears in a historical documentary-like montage at a certain location in the stadium. Well, it's interesting to me because I try to think of... I'm not that well-authored. I can spend a lot of money on club-level seats, but when I have been with friends, the actual photo or the fact that on a history from 18-something to something, the fact that some of the photos may have used it didn't, wouldn't draw me, but what would draw me was the food. I mean, I wanted something good to drink, and I wanted, you know, something nice to eat. If it was a rainy day, I wanted a little cover over my head so I could watch the game and not get wet. That's particularly important with football because they play in the rain. And I wanted a good view. And, you know, I wanted to be just so high. And the question of whether something that appeared incidentally in a photograph, it wouldn't matter a hoot to me. Well, I think that's our point. It's not, it's how it's used. And museums charge admission. Raskov, let me ask you, I mean, because the NFL is not a museum. It's a for-profit entity. I think you made a comment that historical films, these films are all at best incidental to merchandising, but the NFL is hard, I'm hard put to find a better merchandiser of its product than the National Football League. Isn't this all about money? And if it's all about money and commercialism, why shouldn't the plaintiff be entitled to some protection for its use? No doubt that the NFL is a commercial enterprise, unabashedly. But fair use, which is what we're dealing with here today, is case by case. And when you have a use of the logo in question... Well, I guess my point is, we're not dealing with a non-profit museum here, is the point. And so Judge Duncan's concern about the exclusivity of this club-level area, irrespective of how individuals might attribute importance to some aspects of the ambiance, the food, the drink, the pictures, the fact that we are dealing with a commercial enterprise is significant. It's certainly relevant. Well, the fair use factors don't deal with the status of the user. They deal with the purpose and character of the use itself. Which is commercial. I mean, every documentarian attempts to make money when he sells a documentary. It's not about... But I'm having trouble understanding how what you're saying is responsive to what Judge Diaz and I, or at least I, am attempting to articulate. And that is, it really isn't a museum. It is a limited-access facility the displays in which are designed to help attract people and enhance profit. Now, I'd certainly take your point that the role that the logo plays in that may be impossible to ascertain. But it's very hard for me to see a club-level which is designed to maximize profits from attendees as at all analogous to a museum. Well, there are plenty of cases in the record that we've submitted. Green Day is a good example. They're out to make money. I think your response, to just get back on track here, is the fact that fair use is always, almost always determined in a profit-making enterprise. When someone writes any kind of book, they want to make profit. And when somebody makes a film  and if profit-making and commercial ventures were excluded from the fair use doctrine, there'd be no fair use at all because there are situations where museums may not be out to make a profit, but the vast majority of fair uses are undertaken with respect to commercial enterprises. And in this case, the word comment appears right in the preamble of Section 107. Each of the four uses here, of the four documentaries, the stadium photos, are all designed to comment. And it's user-neutral term. It's not who is commenting. It is, is it a comment? And what we have here, I believe, are classic comments. And probably the easiest, from the point of view of, is this a commentary, would be the entire history of football in the city of Baltimore laid out on photos and with descriptive commentary. People going, those people who are paying, are going to learn about how football started in the 1880s, and they're going to go right through to the old Baltimore Colts. They're going to learn about the Colts. They're going to learn about the CFL when it was here. Then they're finally going to get to a snippet about the Ravens in 1996, where, naturally enough, a game program that happens to accurately, historically, show the logo and a ticket. And then you move on to newer times and a different logo. That logo is retired. We're using it only when it is necessarily used to tell a story. We are in the same position as a documentarian is in this particular context. We are not in a different position. There's nothing... But not in the same position as you were in Bouchat 4 with respect to the lobby display. I think, really, that's the principal point that I wanted to emphasize, that the calculus is a little bit different. You would acknowledge that. The calculus is different, but the cases don't spin on that particular calculus. They spin on the calculus of, how was that copyrighted work used? And in that context, we are absolutely no different. In fact, you know, we are... The National Football League is an historian of the game. If we aren't telling the story of the game for people to learn about, well, there is going to be a void. And is that a good thing or a bad thing? I don't think it's a good thing. I don't think any football fan would think it's a good thing. It's not about whether the enterprise happens in some other ways, shapes, and forms is successful. At least that's my understanding of fair use doctrine. And again, it's case by case. We're not saying that there's no way any other time there could be a case where, yes, a different result could arise. But it certainly isn't here where we fall directly within the preamble of Section 107 as providing the public with comment. Any questions? I'm free to answer anything. Thank you very much. If you look at specifically Joint Appendix page 151, you'll see where the Ravens are advertising on their website the display, at least this sort of timeline display, as part of the amenities. These amenities, while being fostered as that of historians, could easily be those amenities in a bar and grill someplace. What years does the historical narrative include? I would say my recollection is probably from somewhere around the turn of the century, the last century, up to present. Yeah, there's some displays in there about, and this is all depicted in the Joint Appendix, displays that go back to early football and Baltimore and all the way up. So it's all part of that. But you have to remember, it's all wall covering in a restaurant, and we're dealing with this on a motion for summary judgment. It's wall covering in a restaurant. Isn't it a different historical narrative? Aren't you telling a different story from what you're doing with the highlight film? It may be a different story, but the different story... This is a very incidental part. Yeah, I know that the courts mentioned incidental several times, but I think that really, in terms of determining whether it's transformative or not, it's not the appropriating work that's at issue, it's the transformation of the appropriated work that's at issue. And to a certain degree, this incidental crept in in the contentions of the defendants in Boucher 4, where we were attempting to push the incidental use under Factor 3. And to some degree... But we're talking about two years in a historical narrative of how many years? Well, it's three years out of, at least in terms of the Ravens' history, and they were there since 1996. You're talking about the Ravens and the Colts... It goes back quite a ways. ...in Baltimore. Well, I can see that, but again... But how many years? I mean, this covers, what, three seasons? Oh, it could be as much as 120... It's in the appendix. It could be 110, 112 years. But... I mean, I recognize the NFL is polarizing, and, you know, people have strong views about the NFL in various ways. What I worry about with this case is that it will extend to uses beyond the immediate... Well, it doesn't, because, again, it goes back to the distinctive fact of the people responsible for the original infringement are the people who... But the point is, I mean, I keep... I don't know of any... Most fair uses are undertaken in the context of commercial ventures. They're... Well, I agree. They're fair uses, and, you know, it's part and parcel of what commerce is all about. That's correct. But in terms of, at least going back to the displays at the stadium, what Part 3B1, again, purpose and character regarding the displays in the lobbies, the panel held that one, or the opinion, states that, one, this was a discreet area, artifacts, and two pictures, and no commercial use. But that comment... But when they market this club-level experience, even if they're marketing the ambience and the wall decor, they're still marketing the historical narrative as a whole. They're not seizing on this to make a... That's correct. But going back, the point I was trying to make was that the opinion, because we dealt with the original infringer here and said the original infringer was not attempting to exploit its original infringement. That's what the opinion with regard to the... the tickets and what have you, by comparison contrasted in that section of the opinion that it found what was reprehensible, or at least in terms of indefensible, I think was the exact term, was the commercial use by the original exploiter of the work coming back with very similar types of exploitation. And again, the focus is not on... Do you have a district court finding that they were acting in bad faith or that they were attempting... Well, the court said there was no... I don't know that we can go outside that we can push the record that far. Well, the court found there was no evidence of bad faith, but we put in the record in this case... Did you urge a finding of bad faith? We raised that in a briefs. We raised that in oral argument. The court didn't agree with it. Well, if I could... What I'm trying to tell the court is someone in this chain of custody took Mr. Boucher's copyrighted C thing and signature off of it, and all through the original case, there was a denial by the defendants of Mr. Boucher's authorship. Certainly... I go back to the point. We do rely on district court findings, and you would love to have a finding that this defendant had proceeded in bad faith or that this defendant had undertaken commercial exploitation, but you don't have that here. What you have, Mr. Shulman, is a very incidental part of not a highlight reel or a highlight film, but of a long historical narrative that traverses well over a century. And as I say, I know when you get the NFL, they're the bad guys. You know, they're rich. They're out to make money. They're out to... You know, they're greed personified. And the problem is these kind of rulings have implications far beyond this setting, and particularly for all kinds of commercial uses which are perfectly benign. But not by the thief. That's what makes this case different. Additionally, the aspect here in terms of if the judge didn't find that there was evidence, remember, it's summary judgment in terms of there's no factual findings, certainly enough in the record for us to prevail on that particular point for purposes of summary judgment, I mean, quite clearly. And with regard to the incidental use, I submit that's not the law of copyright, as I understand it. It has to go with the amount of the work that's being appropriated, not the appropriating work. Thank you for your attention. Except I see that... Am I over? All right. Thank you, because I see one... Thank you very much. We'll adjourn court and come down and greet counsel.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Albert Diaz